

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

ROBERT SCHANNE                              :
281 Ivy Lane                                :       CIVIL ACTION
Glen Mills, PA 19342                        :
                                            :       No. 11-7707
                Plaintiff,                  :
                                            :
         v.                                 :
                                            :       JURY TRIAL DEMANDED
LOWER MERION SCHOOL DISTRICT                :
301 East Montgomery Avenue                  :
Ardmore, PA 19003   and                     :
                                            :
CHRISTOPHER MCGINLEY                        :
Individually and in his capacity            :
as Superintendent of the Lower Merion School District   :
301 East Montgomery Avenue                  :
Ardmore, PA 19003   and                     :
                                            :
MARTHA YODER                                :
Individually and in her capacity            :
as Director of Human Resources of the       :
Lower Merion School District                :
301 East Montgomery Avenue                  :
Ardmore, PA 19003   and                     :
                                            :
DIANE DIBONAVENTURO                         :
Individually and in her capacity as President/member of   :
the Lower Merion School District Board of   :
School Directors                            :
 301 East Montgomery Avenue                 :
Ardmore, PA 19003   and                     :
                                            :
MELISSA GILBERT                             :
Individually and in her capacity as Vice-President/member :
of the Lower Merion School District Board of   :
School Directors                            :
 301 East Montgomery Avenue                 :
Ardmore, PA 19003   and                     :
                                            :
GARY FRIEDLANDER                            :
Individually and in his capacity as a member of the   :
Lower Merion School District Board of School Directors   :
 301 East Montgomery Avenue                 :
Ardmore, PA 19003   and                     :



FILED

JAN 31 2012

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

JEROLD NOVICK    ✓               :
Individually and in his capacity as a member of the   :
Lower Merion School District Board of School Directors   :
 301 East Montgomery Avenue             :
Ardmore, PA 19003    and                :
                                          :
VIRGINIA POLLARD    ✓            :
Individually and in her capacity as a member of the   :
Lower Merion School District Board of School Directors   :
 301 East Montgomery Avenue             :
Ardmore, PA 19003    and                :
                                          :
DAVID EBBY                         :
Individually and in his capacity as a member of the   :
Lower Merion School District Board of School Directors   :
 301 East Montgomery Avenue             :
Ardmore, PA 19003    and                :
                                          :
SUSAN GUTHRIE                  :
Individually and in her capacity as a member of the   :
Lower Merion School District Board of School Directors   :
 301 East Montgomery Avenue             :
Ardmore, PA 19003    and                :
                                          :
LISA FAIR –PLISKIN             :
Individually and in her capacity as a member of the   :
Lower Merion School District Board of School Directors   :
 301 East Montgomery Avenue             :
Ardmore, PA 19003                      :
                                          :
                         Defendants.         :

## FIRST AMENDED CIVIL ACTION COMPLAINT

The above-named Plaintiff, by and through his undersigned counsel, hereby avers as follows:

## I.    Introduction

1.     Plaintiff Robert Schanne (hereinafter "Plaintiff"), an acclaimed physics teacher at Lower

Merion High School, has initiated the instant action to recover damages incurred as a result of

his firing by Defendants and Defendants' deprivation of rights secured to him under the United States Constitution.

## II.   Parties

2.      The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

3.      Plaintiff is an adult individual and citizen of the state of Pennsylvania with an address as set forth above.

4.      Defendant Lower Merion School District (hereinafter "Defendant District" unless otherwise noted) is a municipal corporation within the Commonwealth of Pennsylvania with a principal place of business at 301 East Montgomery Avenue, Ardmore, PA 19003.

5.      Defendant Christopher McGinley (hereinafter "Defendant McGinley") is an adult individual and citizen of the Commonwealth of Pennsylvania with an address as captioned above.

6.      At all times relevant hereto, Defendant McGinley served as Superintendent of the Defendant District.

7.      As discussed *infra,* Defendant McGinley also authored, on behalf of the Lower Merion School District, a letter dated January 4, 2011 which was sent to all Lower Merion School District parents, defaming Plaintiff's character and reputation.

8.      Defendant Martha Yoder (hereinafter "Defendant Yoder") is an adult individual and citizen of the Commonwealth of Pennsylvania with an address as captioned above.

9.      At all times relevant hereto, Defendant Yoder served as Director of Human Resources for the Defendant District.

10.     As discussed *infra,* Defendant Yoder undertook a purported "investigation" into the false allegations against Plaintiff and yet (before Plaintiff was fired) ignored a January 20, 2011

communication from Plaintiff's counsel requesting (among other things) that Plaintiff be granted a chance to "correct the record" and "defend himself on the unfounded charges and that he be given an opportunity "to set the record straight and . . . clear his name and to continue his employment." *See infra.*

11.     Defendant Diane Dibonaventuro (hereinafter "Defendant Dibonaventuro") is an adult individual and citizen of the Commonwealth of Pennsylvania with an address as captioned above.

12.     At all times relevant hereto, Defendant Dibonaventuro served as the president of the Defendant District's Board of School Directors.

13.     Defendant Dibonaventuro voted to fire Plaintiff on January 24, 2011.

14.     Defendant Melissa Gilbert (hereinafter "Defendant Gilbert") is an adult individual and citizen of the Commonwealth of Pennsylvania with an address as captioned above.

15.     At all times relevant hereto, Defendant Gilbert served as the vice-president of the Defendant District's Board of School Directors.

16.     Defendant Gilbert voted to fire Plaintiff on January 24, 2011.

17.     Defendant Gary Friedlander (hereinafter "Defendant Friedlander") is an adult individual and citizen of the Commonwealth of Pennsylvania with an address as captioned above.

18.     At all times relevant hereto, Defendant Friedlander served as a member of the Defendant District's Board of School Directors.

19.     Defendant Friedlander voted to fire Plaintiff on January 24, 2011.

20.     Defendant Jerold Novick (hereinafter "Defendant Novick") is an adult individual and citizen of the Commonwealth of Pennsylvania with an address as captioned above.

21.    At all times relevant hereto, Defendant Novick served as a member of the Defendant District's Board of School Directors.

22.    Defendant Novick voted to fire Plaintiff on January 24, 2011.

23.    Defendant Virginia Pollard (hereinafter "Defendant Pollard") is an adult individual and citizen of the Commonwealth of Pennsylvania with an address as captioned above.

24.    At all times relevant hereto, Defendant Pollard served as a member of the Defendant District's Board of School Directors.

25.    Defendant Pollard voted to fire Plaintiff on January 24, 2011.

26.    Defendant David Ebby (hereinafter "Defendant Ebby") is an adult individual and citizen of the Commonwealth of Pennsylvania with an address as captioned above.

27.    At all times relevant hereto, Defendant Ebby served as a member of the Defendant District's Board of School Directors.

28.    Defendant Ebby voted to fire Plaintiff on January 24, 2011.

29.    Defendant Susan Guthrie (hereinafter "Defendant Guthrie") is an adult individual and citizen of the Commonwealth of Pennsylvania with an address as captioned above.

30.    At all times relevant hereto, Defendant Guthrie served as a member of the Defendant District's Board of School Directors.

31.    Defendant Guthrie voted to fire Plaintiff on January 24, 2011.

32.    Defendant Lisa Fair-Pliskin (hereinafter "Defendant Fair-Pliskin") is an adult individual and citizen of the Commonwealth of Pennsylvania with an address as captioned above.

33.    At all times relevant hereto, Defendant Fair-Pliskin served as a member of the Defendant District's Board of School Directors.

34.    Defendant Fair-Pliskin voted to fire Plaintiff on January 24, 2011.

35.    At all times relevant herein, Defendants McGinley, Yoder, Dibonaventuro, Gilbert, Friedlander, Novick, Pollard, Ebby, Guthrie, and Fair-Pliskin acted individually and as agents of the Defendant District and within the course and scope of their employment for the Defendant District.

### III.    Jurisdiction and Venue

36.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

37.    The Court may properly maintain personal jurisdiction over Defendants because their contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *International Shoe Co. v. Washington,* 326 U.S. 310 (1945) and its progeny.

38.    The Court may exercise original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of civil rights.

39.    The Court may also maintain supplemental jurisdiction over any state law claims set forth herein or later added pursuant to 28 U.S.C. § 1367(a) and Rule 18(a) of the Federal Rules of Civil Procedure because they are sufficiently related to the claim(s) within the Court's original jurisdiction that they form part of the same case or controversy.

40.    Venue is properly laid in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) because Defendants reside in and/or conduct business in this judicial district and because the acts and omissions giving rise to the claims set forth herein occurred in this judicial district.

## IV.    Factual Background

41.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

42.    Plaintiff is an adult individual and citizen of the United States with an address as set forth above.

43.    Plaintiff was employed by the Defendant District as a physics teacher from September of 1997 until December 16, 2010, when his employment was involuntarily terminated.

44.    Defendants officially fired Plaintiff on January 24, 2011 at a public meeting of the Board of School Directors.

45.    Defendants had previously suspended Plaintiff on December 16, 2010.

46.    Defendants' decision to fire Plaintiff was allegedly taken as a result of false and unsubstantiated allegations of sexual impropriety submitted to them by one Jenna Addis, who had been Plaintiff's student some eight years before.

47.    Prior to his firing, and between January 20, 2011 and the vote on his firing, Plaintiff requested an opportunity to present a defense to Addis' false allegations before a vote was taken through a letter sent to Defendant Yoder on January 20, 2011.

48.    On January 4, 2011, Defendants issued a false and defamatory communication (signed by Defendant McGinley) to the parents of every student in the Lower Merion School District, asserting that Ms. Addis' false allegations were in fact true, identifying Plaintiff as the subject of those allegations, and stating that his "relationship" with Addis was " . . . absolutely unacceptable and inappropriate" and stating that Plaintiff was in "breach" of the District's "standards." *See* Exhibit "A".

49.     At the time the foregoing communication was issued, Defendants knew or should have known of the spuriousness of Addis' allegations against Plaintiff, but nonetheless sent the defamatory letter knowing it was false or with reckless disregard as to its truth or falsity.

50.     On or about January 20, 2011, Defendant Yoder received a letter from Plaintiff's counsel advising her: (a) that the January 4th 2011 letter was false; (b) that Plaintiff was denied an opportunity to present witnesses or rebut the allegations; (c) that Plaintiff should be given an opportunity to "correct the record" and "defend himself on the unfounded charges;" (d) that Plaintiff had been advised by the Defendant District not to speak publicly about the charges while the District nonetheless released statements to the press and issued the January 4th letter defaming him; and (e) that Plaintiff expected an opportunity "to set the record straight and . . . clear his name and to continue his employment." *See* Exhibit "B".

51.     During her testimony under oath at a school district hearing on December 2, 2011, Yoder was confronted with the letter attached as Exhibit "B" and admitted that she had seen it. *See* attached Exhibit "C" (hearing testimony of Martha Yoder) at pp. 99-100.

52.     Defendants made no response to the January 20th, 2011 letter and never retracted their defamatory statements regarding Plaintiff in the January 4th letter.

53.     Despite their awareness (once they received the January 20th, 201 communication attached as Exhibit "B") that Plaintiff denied the charges made by Addis and wanted an opportunity to respond thereto, Defendant Yoder (and, on information and belief, the other Defendants named herein) ignored the letter of January 20th, 2011, failed to contact either Plaintiff or his counsel, failed to retract the defamatory statements in the January 4th, 2011 letter, and proceeded to fire Plaintiff on January 24, 2011 - without giving him the opportunity to defend himself he had specifically requested through his counsel on January 20, 2011 through

the letter attached as Exhibit "B".   While Defendants had previously provided what they characterize as alleged opportunities for Plaintiff to answer questions (albeit without timely providing all available information about the allegations against him requested by his union representation, such as copies of Addis' statement, an additional witness statement, and certain phone records  prior to Plaintiff's suspension on December 16th, 2010, *see* Exhibit "C" at pp. 96-97) they had no justification for ignoring the January 20th, 2011 communication once they received and were aware of same.

54.     In defaming Plaintiff and then firing him while knowing he had requested an opportunity to explain his aide of the story on January 20, 2011 via the attached Exhibit "B", without affording him the minimum due process protections guaranteed by the United States Constitution, Defendants violated his property interest in his employment, which is specifically protected by the Fourteenth Amendment to the United States Constitution..

55.     Moreover, on or about March 28, 2011, *after* Plaintiff was fired and having learned Plaintiff had sued Addis for defamation, and realizing that they were also likely to be sued in their individual and collective capacities because they could not justify Plaintiff's firing, Defendants engaged in an ill-advised retaliatory effort to add "new" and additional purported "reasons" for Plaintiff's termination, including his exercise of his rights under the First Amendment to the United States Constitution by filing a federal civil lawsuit against Addis in the United States District Court for the Eastern District of Pennsylvania. *See* Exhibit "D".

56.     Additionally, Defendants added a charge of "fail[ure] to participate" in its investigation – despite Defendant Yoder's admission as aforesaid that she was aware of the letter of January 20th, 2011 (Exhibit "B" hereto) in which Plaintiff sought to do so on or after January 20th, 2011. *See* Exhibit "C".

57.   Defendants therefore also committed a *per se* violation of Plaintiff's First Amendment rights in basing his firing in whole or in part on his exercise of his First Amendment right to free expression, and also added a charge of "failure to cooperate" which Defendant Yoder's recent testimony proves to be utterly false, since she acknowledged receiving the January 20th, 2011 letter. *See* attached Exhibit "C" at pp. 99-100.

58.   Upon information and belief, the reason for Defendants' rush to judgment as to the false allegations against Plaintiff is clear:   At the time of the false allegations made by Addis, Defendants had been repeatedly lambasted in the national press for their covert installation of video cameras in student computers and their subsequent use of those cameras to observe and monitor students without their knowledge in their bedrooms and other private areas.

59.   Upon information and belief, Defendants' January 4th, 2011 communication, and subsequent firing of Plaintiff, were intended as a public relations effort to reassure parents of Lower Merion students (at Plaintiff's expense) that the Defendant District was committed to "doing everything it could to ensure the safety and well-being of students," *see* Exhibit "A," and help to create a positive public image to help rectify the damage created by the Defendant District's unlawful video monitoring program.

60.   Indeed, the January 4th, 2011 letter leads off with the comment quoted in paragraph 59 before it even begins to discuss the allegations against Plaintiff as if they are already proven. *See* Exhibit "A"

61.   The communication itself acknowledges that it is "long-standing practice" for the Defendant District "not to discuss on-going investigations," yet - in the same paragraph – it does precisely that, outlining details of the allegations against Plaintiff and implying they are true as a fact. *See* Exhibit "A".

62.     Given their belief that they needed a "sacrificial lamb" to rectify the public relations disaster created by their covert monitoring of children in private areas, Plaintiff's guilt or innocence were simply irrelevant to Defendants, and they made a conscious decision to deny him his constitutional rights in their zeal to demonstrate how swiftly and harshly they dealt with teachers accused of improper conduct with students (even those, like Plaintiff, who had not committed such conduct).

63.     Defendant Yoder has impliedly admitted this was the case, since she indicated in her testimony at the December 2nd, 2011 hearing that no information she could have received from Plaintiff would have changed her mind as to his alleged guilt on the false allegations made by Addis. Specifically, Defendant Yoder was asked the question: "[k]nowing what you know now, would you still have fired [Plaintiff] at the time?" Her answer to the foregoing question was "[y]es." *See* testimony attached as Exhibit "C" at p. 96.

64.     Plaintiff is currently prosecuting a defamation lawsuit against Addis as a result of her lies and false communications to the Defendant District.

65.     Defendant Yoder's statements evidence an intent by the Defendants to "railroad" Plaintiff and deny him due process in their haste to remove him from his position - regardless of his guilt or innocence - in order to recover some shred of credibility after the covert monitoring debacle.

66.     As a direct result of Defendants' actions as aforesaid, Plaintiff has sustained damage to his liberty and property interests and to his reputation, and has been deprived of his public employment and his ability to earn a living.

## COUNT ONE
## CIVIL RIGHTS VIOLATIONS (42 U.S.C. § 1983)
### Plaintiff v. All Defendants

67.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

68.   Each of the Defendants acted under color of state law at all times relevant hereto.

69.   In suspending Plaintiff on December 16th, 2010, issuing the false and defamatory letter attached hereto as Exhibit "A" on January 4th, 2011 and thereby stigmatizing his reputation, in firing Plaintiff on January 24, 2011 despite knowledge of his January 20, 2011 letter in which he specifically sought to explain his version of the false charges against him, and denying him the opportunity he sought in the aforesaid letter after its receipt, Defendants deprived Plaintiff of rights secured to him under the Fifth and Fourteenth Amendments to the United States Constitution, including but not limited to his property right in his public employment, his liberty interest in his reputation, and his right to due process.

70.   In knowingly adding false "reasons" for Plaintiff's firing on March 28, 2011, including but not limited to his exercise of his rights under the First Amendment to the United States Constitution by filing a lawsuit in a United States District Court, Defendants deprived Plaintiff of rights secured to him under the First and Fourteenth Amendments to the United States Constitution and retaliated against him for exercising his First Amendment rights.

71.   As a direct and proximate result of the above-described unlawful conduct of Defendants, committed both in their respective individual capacities and under color of their authority as officials of the Lower Merion School District, and while acting in that capacity, Plaintiff has suffered  harm to his property and liberty interests and to his reputation.

72.   Plaintiff is entitled to attorney's fees and costs of prosecution of this action pursuant to 42 U.S.C. Section 1988.

      WHEREFORE, Plaintiff respectfully requests the relief set forth in the attached *Ad Damnum* Clause.

## COUNT TWO
## CIVIL RIGHTS VIOLATIONS (42 U.S.C. §§ 1983 and 1985)
### Plaintiff v. Defendants McGinley, Yoder, Dibonaventuro, Gilbert, Friedlander, Novick, Pollard, Ebby, Guthrie, and Fair-Pliskin

73.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

74.    At all times relevant herein, Defendants McGinley, Yoder, Dibonaventuro, Gilbert, Friedlander, Novick, Pollard, Ebby, Guthrie, and Fair-Pliskin, or some of them, conspired to deprive Plaintiff of his constitutionally and statutorily-guaranteed rights pursuant to the First, Fifth and Fourteenth Amendments to the United States Constitution.

75.    At all times relevant herein, the aforesaid individual Defendants further conspired to conceal the deprivations of rights and liberties set forth above.

76.    These conspiracies constituted and continue to constitute ongoing violations of 42 U.S.C. § 1985.

77.    As a direct and proximate cause of the individual Defendants' unlawful conspiracy to deprive him of his rights as aforesaid, Plaintiff has suffered and continues to suffer the damages set forth herein.

    WHEREFORE, Plaintiff respectfully requests the relief set forth in the attached *Ad Damnum* Clause.

## COUNT THREE
## CIVIL RIGHTS VIOLATIONS (42 U.S.C. § 1983)
### Plaintiff v. Defendant District

78.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

79.    The conduct of the Defendant District and its agents, as set forth herein, constitutes conduct under the color of state law which subjected, resulted and otherwise caused a loss or

deprivation of Plaintiff's rights as secured by the laws of the United States and the laws of the state of Pennsylvania and their respective Constitutions.

80.     The conduct of the Defendant District's agents evidences a custom, policy, pattern, and/or practice of violating the rights of citizens, a deliberate indifference to the rights of citizens and to the duties and responsibilities imposed upon the Defendant District as a public school district, official oppression, and the general abuse of governmental power.

81.     The conduct of the Defendant District's agents demonstrates that the Defendant District:

> i.  Failed properly to screen, and otherwise to hire and employ, persons who are fit and trained to carry out the duties of Superintendent and Director of Human Resources;
>
> ii.  Failed to train and supervise the officers, supervisors and managers in its employ;
>
> iii.  Failed to implement appropriate policies, practices and procedures, including but not limited to, policies, practices, and procedures concerning public comment on employment matters and the investigation of student claims against teachers;
>
> iv.  Failed to take appropriate disciplinary action against supervisors and managers who violate(d) the laws and the rights of citizens of the Commonwealth of Pennsylvania and the United States;
>
> v.  Failed to conduct systematic and complete investigations of complaints and other matters related to teacher employees;
>
> vi.  Otherwise maintained a custom, policy, pattern, and/or practice of violating the rights of citizens.

82.     As a direct and proximate result of Defendants' conduct, as described herein, Plaintiff has suffered damages to his liberty and property interests and to his reputation as aforesaid.

        WHEREFORE, Plaintiff respectfully requests the relief set forth in the attached *Ad Damnum* Clause.

## *AD DAMNUM* CLAUSE/PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendants and that it enter an Order as follows:

a. Defendants are to be permanently enjoined from discriminating against or retaliating against Plaintiff on any basis forbidden by applicable law and restore Plaintiff to employment forthwith;

b. Defendants are to compensate Plaintiff, reimburse Plaintiff, and to make Plaintiff whole for any and all monies and other benefits Plaintiff would have received had it not been for Defendants' unlawful actions, including but not limited to back pay, front pay, compensation increases, bonuses, medical and other benefits, training, promotions, pension, and seniority. Plaintiff should be accorded all monies and benefits withheld from December 16th, 2010 until the date of verdict;

c. Plaintiff is to be awarded actual damages, as well as damages for the pain, suffering, and humiliation caused to him by Defendants' actions;

d. Plaintiff is to be awarded punitive damages as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendants for their willful, deliberate, malicious, and outrageous conduct, and to deter Defendants and other persons or entities from engaging in such misconduct in the future;

e. Plaintiff is to be accorded any and all other equitable and legal relief as the Court deems just, proper, and appropriate;

f. Plaintiff is to be awarded the costs and expenses of this action and reasonable attorneys' fees as provided by applicable federal and state law;

g. That the Court is to maintain jurisdiction of this action after verdict to ensure compliance with its Orders therein;

h. Plaintiff's claims are to receive a trial by jury.

Respectfully submitted,

KOLMAN ELY, P.C.

By: /s/ Timothy M. Kolman, Esquire
Timothy M. Kolman, Esquire
Wayne A. Ely, Esquire
414 Hulmeville Avenue
Penndel, PA 19047
Attorneys for Plaintiff

January 30, 2012

# EXHIBIT "A"



# Lower Merion School District

301 East Montgomery Ave.        Ardmore, PA 19003-3399
Phone: 610-645-1930    Fax: 610-645-0703    www.lmsd.org
*Christopher McGinley, Ed.D.    Superintendent of Schools*

January 4, 2011


Dear Parents/Guardians,

It is our commitment to do everything we can to ensure the safety and well-being of students. This includes providing you with accurate and complete information about concerns and issues – even if the subject matter may be uncomfortable. I am writing to you today to share information about a matter that requires the attention of you and your child/children at Lower Merion High School.

Although it is a long-standing practice of the District to not discuss on-going investigations relating to personnel, we believe it is important to clarify the reasons behind a recent staffing change at Lower Merion. In December, the District received information alleging that a physics teacher, Robert Schanne, engaged in a dating relationship more than five years ago with an 18-year-old high school student while she was his student. The evidence does not suggest any criminal conduct by Mr. Schanne. However, it is absolutely unacceptable and inappropriate for any teacher to have this type of a relationship with a student. Our District expects the highest standards of conduct from its employees, including its teachers, and any breach of those standards is a very serious matter.

To this end, Mr. Schanne has been suspended from all school duties pending the outcome of the District's investigation. Current students of Mr. Schanne have received information from Mr. Hughes about a teacher who will be replacing Mr. Schanne for the remainder of the school year.

If any additional information comes to light of which parents of current or former students should be aware, we will communicate that information in a timely manner.

If you have any questions or concerns, please contact me or Mr. Hughes.

Thank you for your attention to this matter.

Sincerely,

Christopher McGinley, Ed.D.
Superintendent

# EXHIBIT "B"

# KOLMAN ELY, P.C.

414 Hulmeville Avenue
Penndel, PA 19047

(215) 750-3134
FACSIMILE (215) 750-3138
www.kolmanely.com

January 20, 2011

**_Via Facsimile – 610-645-9536 and Regular Mail_**
ATTN: Marty A. Yoder, Ed.D.
Director of Human Resources
Lower Merion School District
301 E. Montgomery Avenue
Ardmore, PA 19003-3399

### Re:   *Robert Schanne*

Dear Ms. Yoder:

Be advised this office has been retained by Robert Schanne with regard to any and all matters arising out of his employment with Lower Merion School District.

As an initial matter, Lower Merion Township sent a defamatory letter to parents prior to any response by my client to any of the charges made by Jenna Addis. The letter was defamatory because Christopher McGinley, Superintendent, stated "The evidence does not suggest any criminal conduct by Mr. Schanne. However, it is absolutely unacceptable and inappropriate for any teacher to have this type of relationship with a student." In his choice of language and in the juxtaposition of these sentences, he made it clear to the parents that the improper conduct had actually occurred and that our client was guilty of it. This defamation was published to all the parents and guardians of our client's pupils. As a direct consequence, our client's reputation and character were immediately and irreparably impugned. We are requiring the Township to send another letter to all of the parents, with language which we will both agree on, indicating that the prior letter was in error and the Township regrets any besmirching, sullying or defaming of my client's reputation.

Second, my client's *"Loudermill"* rights were significantly violated. He never got an opportunity to present any witnesses, or cross-examine the School District's witnesses, rebut its evidence and present his own.

It is my understanding that the School Board will meet to determine whether my client should be terminated from employment from Lower Merion Township. This letter is to urge restraint on the part of Lower Merion Township so that the record can be properly corrected and my client can properly defend himself fully and completely against these unfounded charges.

Finally, you informed my client that he was not to make any comment to anyone regarding the allegations and neither was he to contact his accuser because such conduct would be regarded as retaliation. Further, you required my client to keep all aspects of the case strictly confidential. My client was muzzled while the School District spoke to the press and besmirched his reputation to the parents. Meanwhile, my client's obligation not to comment resulted in an implication to the press that the charges were well founded. No one from the Township ever bothered to tell the press or any inquirer that my client had denied all the charges. Instead the Township allowed a false impression to continue to exist both in the press and in the community. This was not a fair or proper way to treat a teacher who has an excellent reputation and who has given good service to the Township and to the pupils he has taught.

We expect Lower Merion Township to set the record straight and to give our client a complete opportunity to clear his name and to continue his employment.

Lower Merion's rush to judgment was neither fair nor appropriate.

Please have your counsel contact me on receipt of this letter so that the record can be set straight immediately.

Very truly yours,

KOLMAN ELY, P.C.

Timothy M. Kolman, Esquire

TMK/lmc

cc:     Charles Herring – *via email - CHerring@psea.org*

# EXHIBIT "C"



# In The Matter Of:

*Lower Merion Education Association and*
*Lower Merion School District*

---

*Arbitration - Grievance:  Robert Schanne, Termination*
*Volume I*
*December 2, 2011*

---

*The Roberts Reporting Firm*
*Professional Reporters*
*230 South Broad Street, Suite 700*
*Philadelphia, PA  19102*
*(215) 732-1331*

Original File PSEA1202.V1

Page 73

1   percent accurate.  They have paid for her
2   plane flight here, she has parents that
3   live here, if necessary she could get on
4   a plane and come back.
5   MR. ROOS:  We have no ability to
6   compel her.
7   MR. HERRING:  She could
8   voluntarily do so if we asked.
9   MR. ROOS:  Of course; but there
10  is no means by which we can compel her.
11  MR. HERRING:  But there is no
12  prohibition about her coming back.  If
13  she chooses to voluntarily come back,
14  because either Mr. Roos asks her or I ask
15  her, she is more than free to do so.
16  ARBITRATOR BROGAN:  That is
17  correct, she could voluntarily come
18  back.  I have no subpoena power to
19  require her.
20  MR. HERRING:  Understood.  Just
21  give me one moment.
22  ARBITRATOR BROGAN:  Off the
23  record.
24  (Brief pause.)

Page 74

1   MR. HERRING:  That's it.
2   ARBITRATOR BROGAN:  I thank you
3   for your testimony.
4   MR. ROOS:  May I just ask for a
5   short break so I can excuse Ms. Addis?
6   ARBITRATOR BROGAN:  Sure.  Let's
7   go off the record.
8   (Brief recess at 12:10 p.m.)
9   - - -
10  (Ms. Addis leaves and Dr. Yoder
11  arrives to the arbitration room.  The
12  arbitration continued as follows at 1:20
13  p.m.)
14  ARBITRATOR BROGAN:  My
15  understanding is that the parties will
16  stipulate with regard to Lower Merion
17  School District 1 that Sean Hughes, if
18  called to testify -- I guess we are
19  stipulating this is factual, correct?
20  MR. ROOS:  Yes.
21  ARBITRATOR BROGAN:  We are
22  stipulating as a fact that Lower Merion
23  School District 1 reflects Mr. Hughes'
24  typed version of his contemporaneous

Page 75

1   conversation with Ms. Addis and that
2   conversation took place on --
3   MR. HERRING:  No, his
4   contemporaneous notes.
5   ARBITRATOR BROGAN:  What did I
6   say?
7   MR. HERRING:  Conversation.
8   ARBITRATOR BROGAN:  Let's start
9   again.  The parties stipulated that Lower
10  Merion School District 1 reflects the
11  typed version of Mr. Sean Hughes'
12  contemporaneous notes of his conversation
13  with Ms. Addis via telephone.
14  MR. HERRING:  Correct.
15  ARBITRATOR BROGAN:  Is that a
16  correct stipulation?
17  MR. ROOS:  Yes.
18  ARBITRATOR BROGAN:  All right.
19  - - -
20  MARTHA YODER, Ed.D., having been
21  duly sworn as a witness, was examined and
22  testified as follows...
23  - - -
24  ARBITRATOR BROGAN:  Could you

Page 76

Martha Yoder, Ed.D. - direct

1   please state your name for the record.
2   THE WITNESS:  Sure, Martha
3   Yoder.
4   ARBITRATOR BROGAN:  Thank you.
5   DIRECT EXAMINATION
6   BY MR. ROOS:
7  Q.  Good afternoon, Dr. Yoder.
8  A.  Good afternoon.
9  Q.  Could you state as of last December 2010
10  what was your position with the District at that
11  time?
12  A.  My position was director of human
13  resources for the Lower Merion School District.
14  Q.  Are you currently employed by the School
15  District?
16  A.  I am not, I am currently retired.
17  Q.  How long had you held the position of
18  director of human resources for the District?
19  A.  Ten years.
20  Q.  Generally, describe your responsibilities
21  in terms of investigations of employee
22  misconduct?
23  A.  It was my responsibility to investigate
24  any accusations, any complaints, whether it be

Martha Yoder, Ed.D. - direct                                    Page 77

1   misconduct, sexual harassment, any complaint, any
2   potential violation of Board policy and I would
3   conduct the investigation and make
4   recommendations at the conclusion of the
5   investigation.
6   Q.   Do you know Mr. Schanne?
7   A.   I do know Mr. Schanne.
8   Q.   How long, if you know, was he employed by
9   the School District?
10  A.   Approximately 14 years. I believe he
11  started in the late '90s, 1997 I believe.
12  Q.   Did you have any involvement in the
13  events that led to the termination of Mr.
14  Schanne's employment?
15  A.   Yes, I did.
16  Q.   Were you involved in the decision to
17  terminate Mr. Schanne?
18  A.   Yes, I was.
19  Q.   Why was Mr. Schanne terminated?
20  A.   He was terminated for having an
21  inappropriate relationship with a student, who
22  was a student at that time, and also for
23  insubordination.
24  Q.   What is the name of the student?

Martha Yoder, Ed.D. - direct                                    Page 79

1   prohibited.
2   Q.   What does a sexual relationship include,
3   does that include hugging, kissing, touching?
4   A.   Hugging, kissing, any kind of a dating
5   relationship, any kind of physical interaction
6   between the staff member and the student.
7   Q.   Would oral sex constitute sexual
8   relationship?
9   A.   Absolutely.
10  Q.   Would being naked in the presence of the
11  teacher by the student constitute sexual
12  relations?
13  A.   Absolutely.
14  Q.   Even the hugging, the kissing and the
15  touching would constitute that?
16  A.   Yes.
17  Q.   When did the misconduct occur that you
18  are aware of?
19  A.   During Ms. Addis' senior year, which was
20  2002-2003.
21  Q.   I'm sorry, I only referred you to Exhibit
22  17. What is Exhibit 18? Does it say the same
23  thing?
24  A.   Yes, it is.

Martha Yoder, Ed.D. - direct                                    Page 78

1   A.   The student was Ms. Jenna Addis.
2   Q.   What was the insubordinate conduct?
3   A.   The insubordination was the fact that he
4   refused to participate in the investigation. As
5   we conducted the investigation we attempted to
6   meet with him several times. The first meeting
7   he --
8   Q.   You don't have to go into the detail, but
9   it was failure to cooperate?
10  A.   A. Failure to cooperate.
11  Q.   I'm going to ask you more specific
12  questions now. When you were there at all
13  relevant times, did the School District have
14  policies regarding teachers dating students or
15  otherwise being romantically involved with them?
16  A.   Yes. The sexual harassment policy is
17  very specific.
18  Q.   Can you take a look at Exhibit 17 and
19  tell me what that is?
20  A.   That is the policy regarding sexual
21  harassment.
22  Q.   What does it say about sexual relations
23  between staff and students?
24  A.   Item C says that it is strictly

Martha Yoder, Ed.D. - direct                                    Page 80

1   Q.   One policy deals with professional
2   employees and one deals with students?
3   A.   Yes.
4   Q.   Different sections of the manual?
5   A.   (The witness nods.)
6   Q.   When did you find out about the
7   misconduct?
8   A.   Approximately, a year ago. It was after
9   Thanksgiving 2010, I believe the first
10  information came across my desk early December,
11  December 1st, 2nd of 2010.
12  Q.   Who had notified you?
13  A.   The current principal of Lower Merion
14  High School, Mr. Sean Hughes.
15  Q.   If you would take a look at Exhibit 1.
16  Do you recognize that?
17  A.   Yes, I do. That is the incident report
18  that he shared with me.
19  Q.   Did you interview Ms. Addis?
20  A.   I did interview Ms. Addis.
21  Q.   How many separate occasions?
22  A.   Two.
23  Q.   Phone or in person?
24  A.   Telephone.

Martha Yoder, Ed.D. - direct                                    Page 81

1  Q.  Why was it by phone?
2  A.  She currently lives in New Orleans, so it
3    was easier to conduct the conversation by phone.
4  Q.  What is Exhibit 2?
5  A.  Exhibit 2 is the statement of Jenna
6    Addis.  During the telephone conversation both
7    Mr. Hughes and I took very extensive notes,
8    writing down wherever possible exact quotes.
9       MR. HERRING: Can you direct the
10      witness to only talk about what she did
11      and not what Mr. Hughes did, unless they
12      were present together.
13      BY MR. ROOS:
14  Q.  Were you and Mr. Hughes present together?
15  A.  Yes, we were.
16      ARBITRATOR BROGAN: That's fine,
17      go ahead.
18      THE WITNESS: Following the
19      interview with Ms. Addis, I wrote up the
20      notes of what she had told us, compared
21      that with Mr. Hughes and his recollection
22      of the conversation.  He compared it to
23      his notes to make sure that what was
24      written down was accurate.  I sent the

Martha Yoder, Ed.D. - direct                                    Page 82

1       statement to Ms. Addis, asked her to
2       review it and what did was make the
3       changes she felt were appropriate based
4       on what she thought was a more accurate
5       rendition of the conversation.
6       BY MR. ROOS:
7  Q.  How did it get back to you?
8  A.  I believe it was e-mailed.
9  Q.  Is this statement, Exhibit 2, in the form
10   in which it was returned to you by Ms. Addis?
11  A.  Yes, with her notes throughout.
12  Q.  Anything on here that you added -- you or
13   anyone else, added after Ms. Addis corrected it
14   and signed it and returned it?
15  A.  No.
16  Q.  Did you interview anyone else?
17  A.  I interviewed Mr. Brian -- I believe it
18   was Cohen -- Cohen, who was a friend of Ms.
19   Addis.
20  Q.  Did you create a statement for him just
21   like you did for Ms. Addis?
22  A.  I did, exactly the same procedure.
23  Q.  Take a look at Exhibit 3.
24  A.  Okay.

Martha Yoder, Ed.D. - direct                                    Page 83

1  Q.  Is that the statement?
2  A.  Yes, it is.
3  Q.  Can you tell us how this statement was
4    created?
5  A.  This statement was created, again, using
6    my notes from the conversation that I had with
7    him by phone.  I sent a statement to him.  He
8    corrected the statement and sent back this
9    statement that is signed as the second page of
10   Section 3.
11  Q.  Did you find Mr. Cohen's statements to be
12   consistent with what Ms. Addis told you?
13  A.  Yes, I did.
14  Q.  One question I neglected to ask you about
15   Ms. Addis' statement.  Looking on Page 7 in the
16   fourth paragraph down there is an address and
17   some phone numbers for Mr. Schanne.
18  A.  Yes.
19  Q.  Did you take any efforts to corroborate
20   to see if this information was accurate?
21  A.  Yes.  I went back to his personnel file
22   and confirmed that that information was, indeed,
23   correct.
24  Q.  If you would take a look at Exhibit 20.

Martha Yoder, Ed.D. - direct                                    Page 84

1       Does this contain the information as to -- what
2       is Exhibit 20?
3  A.  This was a summer school application that
4       happened to be part of his file.  It recorded his
5       address at the time that Ms. Addis was a senior,
6       also his phone number.  So it confirmed the
7       information that she had shared with us.
8  Q.  Let's make sure we are right about that.
9       April of 2002 would have been her junior year,
10      correct?
11  A.  I'm sorry, junior year.
12  Q.  That had the phone number and the address
13   that Jenna Addis gave you --
14  A.  Yes.
15  Q.  -- in December 2010?
16  A.  That is correct.
17  Q.  The next page shows the address as of
18   what day, Exhibit 21?
19  A.  This is a change of address that's dated
20   July of 2004 and this is the Phoenixville
21   address.
22  Q.  Did you attempt to interview Mr. Schanne?
23  A.  I did.
24  Q.  When was the first opportunity you gave

Case 2:11-cv-07707-AB   Document 16   Filed 01/31/12   Page 27 of 33

Arbitration - Grievance: Robert Schanne, Termination - Volume I       Lower Merion Education Association and
December 2, 2011                                                      Lower Merion School District

Martha Yoder, Ed.D. - direct                                        Page 85

1  to Mr. Schanne to provide his response to the
   allegations made by Ms. Addis and confirmed by
   Mr. Cohen?
4  A.  The first hearing was held on December
5  16, 2010.
6  Q.  Referencing Exhibit 5, is that your
7  notice to Mr. Schanne of that meeting?
8  A.  Yes, it is.
9  Q.  Did Mr. Schanne appear for that meeting?
10 A.  He did.
11 Q.  Did he have LMEA representation?
12 A.  He did.  Mr. Santa Maria was with him.
13 Q.  Who was present with you?
14 A.  Mr. Sean Hughes, the principal.
15 Q.  Did you create a summary of this meeting?
16 A.  I did.
17 Q.  Is Exhibit 6 that summary?
18 A.  Yes, it is.
19 Q.  During the course of the meeting, did you
20 question Mr. Schanne about his relationship with
21 Ms. Addis when she was a senior at Lower Merion?
22 A.  Yes.  I asked him a number of questions
23 about that relationship based on what we had
24 heard from Ms. Addis.

Martha Yoder, Ed.D. - direct                                        Page 86

1  Q.  Under the section called questions, did
2  you list verbatim the questions that you asked
3  him and what his answers were?
4  A.  Yes, I did.
5  Q.  Were there questions that Mr. Schanne
6  refused to answer?
7  A.  There were a number of questions he
8  refused to answer.  Anything that had to do
9  specifically with his relationship with Ms. Addis
10 he refused to answer.
11 Q.  Why did he refuse?  What was his basis
12 for refusing to answer?
13 A.  He said it was on the advice of his LMEA
14 representative.
15 Q.  Had Mr. Schanne been criminally charged
16 at that point?
17 A.  No, he had not.
18 Q.  Was he ever criminally charged?
19 A.  No.
20 Q.  Did Lower Merion School District ever
21 report Mr. Schanne to the Lower Merion Police
   Department for any reason at all?
   A.  We did not.
24 Q.  Actually, did Lower Merion ever

Martha Yoder, Ed.D. - direct                                        Page 87

1  affirmatively represent that it would not and had
2  no intention of reporting Mr. Schanne?
3  A.  Yes.  As a matter of fact in the
4  follow-up letter from this meeting, when I sent
5  him a formal letter, I indicated that to him.
6  Q.  If I were to go through and ask you if
7  these questions and answers were accurate -- have
8  you had the opportunity to review this document?
9  A.  I did review this document.
10 Q.  Is it accurate?
11 A.  Yes, it is.
12 Q.  Was there an opportunity given to Mr.
13 Schanne for a follow-up meeting?
14 A.  Yes, there was.  That meeting was
15 scheduled in January.
16 Q.  Did you send Mr. Schanne a summary of the
17 Loudermill meeting on December 16th?
18 A.  I did.
19 Q.  Is that Exhibit 7?
20 A.  It is Exhibit 7.
21 Q.  You sent a copy of this to the president
22 of the LMEA, Chris Santa Maria?
23 A.  Yes.  It is copied to him.
24 Q.  Was Mr. Schanne suspended at that time?

Martha Yoder, Ed.D. - direct                                        Page 88

1  A.  He was suspended with pay.
2  Q.  At some point did you indicate to him
3  that there would be a second meeting to give him
4  a chance to tell his side of the story?
5  A.  Yes.
6  Q.  Looking at Exhibit 8, have you seen that
7  before?
8  A.  Yes, I have.
9  Q.  For the record, who was Megan Shafer at
10 that time?
11 A.  Megan Shafer was counsel for the School
12 District at that time.
13 Q.  What does she do now?
14 A.  She is currently the director of human
15 resources.
16 Q.  Was there a request made here for
17 materials?
18 A.  Yes, there was.
19 Q.  Was there any other request, other than
20 this, that you are aware of that either Mr.
21 Schanne or the LMEA on behalf of Mr. Schanne made
22 with regard to the investigatory materials?
23 A.  Not that I'm aware of.
24 Q.  Did the District provide or District

Martha Yoder, Ed.D. - direct                                    Page 89

1    counsel provide the information requested by --
2    in Mr. Herring's letter to Ms. Shafer?
3    A.  Yes.
4    Q.  How was that done?
5    A.  That was done through counsel.
6    Q.  Looking at Exhibit Number 9, do you see
7    an indication of a meeting for the second
8    Loudermill hearing?
9    A.  Yes, January 18th.
10   Q.  What was the response from the attorney
11   for the LMEA, Mr. Herring?
12   A.  That Mr. Schanne would not be attending
13   the meeting, please cancel.
14   Q.  Is there a follow-up letter from Ms.
15   Shafer to Mr. Herring?
16   A.  There is.
17   Q.  Dated what?
18   A.  That is dated January 14, 2011.
19   Q.  That's Exhibit 10, right?
20   A.  That is Exhibit 10.
21   Q.  As of January 18th, was Mr. Schanne still
22   a paid employee?
23   A.  Yes, he was.
24   Q.  What was the outcome of his not attending

Martha Yoder, Ed.D. - direct                                    Page 90

1    that meeting?
2    A.  His failure to attend that meeting meant
3    that we changed his status from a paid leave to
4    an unpaid leave and he was immediately placed on
5    unpaid leave.
6    Q.  Was he subsequently terminated?
7    A.  He was.
8    Q.  Is the basis for termination set forth in
9    Exhibit 11?
10   A.  It is, the statement of charges, notice
11   of hearing.
12   Q.  Just for the record, what is Exhibit 12?
13   A.  Exhibit 12 is the confirmation, the
14   letter, to Mr. Schanne following the action of
15   the Board informing him that the Board had
16   terminated his employment as of January 24, 2011.
17   Q.  What is Exhibit 13?
18   A.  Exhibit 13 is the grievance filed on
19   behalf of the LMEA -- on behalf of Mr. Schanne by
20   the LMEA.
21   Q.  What is Exhibit 14?
22   A.  Exhibit 14 is the response to that
23   grievance.
24   Q.  Who drafted this response?

Martha Yoder, Ed.D. - direct                                    Page 91

1    A.  I did.
2    Q.  What is Exhibit 15?
3    A.  It's an amendment to the statement of
4    charges.
5    Q.  Why were the charges amended?
6    A.  Because after the initial statement of
7    charges the Federal suit was filed.
8    Q.  By who and against who?
9    A.  By Mr. Schanne against Ms. Addis.
10   Q.  Why was that considered to be an
11   additional reason to terminate?
12   A.  In that lawsuit he provided information
13   that he had not provided to the School District
14   during the investigation when he refused to
15   participate.
16       MR. ROOS: If I could just have
17       one minute, please.
18       ARBITRATOR BROGAN: Off the
19       record.
20       (Brief pause.)
21       ARBITRATOR BROGAN: On the
22       record.
23       BY MR. ROOS:
24   Q.  Just one question about Exhibit 4.  Do

Martha Yoder, Ed.D. - direct                                    Page 92

1    you know what Exhibit 4 is?
2    A.  Yes.
3    Q.  What are they and how did you get them?
4    A.  This is a copy of the cell phone bill for
5    Ms. Addis during her senior year.  It looks like
6    the first one is dated December 2002 through May
7    2003.
8    Q.  Whose handwriting is that?
9    A.  Mine.
10   Q.  What were you documenting with those
11   notes there?
12   A.  I was documenting the phone calls from
13   Ms. Addis' cell phone to Mr. Schanne's cell phone
14   and home phone.
15   Q.  Are you the one that blacked out the
16   numbers that weren't --
17   A.  Yes.
18   Q.  -- having to do with Mr. Schanne?  How
19   did you calculate that?
20   A.  I looked at the phone numbers I was aware
21   from Mr. Schanne's personnel file as to what his
22   cell number was and his home number and
23   identified each time it appeared on this bill.
24   Q.  And you counted them?

1  A.  Yes, and I counted them.
2  Q.  If you know, do you know at what point
3    these phone records were made available to Mr.
4  Herring?
5  A.  Late in December of 2010.
6  Q.  Were the statements of Ms. Addis and Mr.
7  Cohen made available to them, as well?
8  A.  Yes.
9     MR. ROOS: I think that's all I
10    have.  In fact, I know that's all that I
11    have.
12    ARBITRATOR BROGAN: Cross.
13    MR. HERRING: Thank you.
14    CROSS-EXAMINATION
15    BY MR. HERRING:
16  Q.  It's your position I received these phone
17    messages, the copies, in December 2010?
18  A.  That's my understanding, at or about that
19    time.
20  Q.  How do you know that?
21  A.  Through counsel.
22  Q.  Megan was your counsel at the time, do
23    you have a copy of a letter where Megan sent
24    these to me?

1  A.  I don't, not in my possession.
2  Q.  These were all calls that you totalled up
3    that were from Ms. Addis to Mr. Schanne?
4  A.  That is correct.
5  Q.  So if you could look at Page 7.
6  A.  Okay.
7  Q.  On that weekend your tally is she called
8    him 34 times?
9  A.  Yes, 34 indicating -- yes.
10  Q.  You also said in your direct testimony
11    that the charges were amended based upon Mr.
12    Schanne's civil lawsuit against Ms. Addis,
13    correct?
14  A.  That is correct.
15  Q.  You stated that you amended the charges
16    because he provided information in the lawsuit
17    that he didn't provide in your investigation,
18    correct?
19  A.  That's what I said.
20  Q.  What information did he provide in the
21    lawsuit that he didn't provide in the
22    investigation?
23  A.  The amended charges say failure to
24    participate in the investigation, to respond to

1    the allegations being --
2  Q.  Stop there for a second.  You knew he
3    hadn't participated, how is that new?
4  A.  So the first bullet is specifically
5    saying that he failed to participate in that and
6    had subsequently filed the lawsuit which provided
7    a great deal of information.
8  Q.  What was the information that you got
9    from the lawsuit that led you to amend the
10    charge?
11  A.  The lawsuit -- and I don't have that in
12    front of me -- specified specific reasons why Ms.
13    Addis may be doing certain things.
14  Q.  You are aware now that Mr. Schanne
15    provided certain reasons in his lawsuit, correct?
16  A.  I read the lawsuit a year ago, I haven't
17    read it recently.
18  Q.  You are aware -- because we attended the
19    Unemployment Comp hearing together -- that he
20    denied having an inappropriate relationship
21    during her senior year with her, correct?
22  A.  At which time?
23  Q.  At the Unemployment Comp hearing.
24  A.  Yes.

1  Q.  Knowing what you know now, would you
2    still have fired him at the time?
3  A.  Yes.
4  Q.  District Exhibit 8 is my letter to Ms.
5    Shafer asking for the materials the District had
6    in its possession; is that correct?
7  A.  That's correct.
8  Q.  When the first meeting took place on
9    December 16th, the materials that I had requested
10    were not made available to Mr. Schanne at that
11    time, correct?
12  A.  I'm not aware that that request was made
13    at that time.
14  Q.  That wasn't my question.  Not having the
15    request is not my question.
16    ARBITRATOR BROGAN: It was your
17    question.
18    MR. HERRING: No, it wasn't.
19    ARBITRATOR BROGAN: Yes, it was.
20    BY MR. HERRING:
21  Q.  My question was the materials that I
22    requested were not available to him at that time?
23  A.  You would have to be specific as to which
24    materials you are referring to.

Case 2:11-cv-07707-AB Document 16 Filed 01/31/12 Page 30 of 33

ower Merion Education Association and Arbitration Grievance: Robert Schanne, Termination Volume I
ower Merion School District                                                    December 2, 2011

artha Yoder, Ed.D. - cross                                          Page 97

1  Q.  How about the statement of Ms. Addis, was
2  that shown to him prior to December 16th?
3  A.  That was not shown to him prior to
4  December 16th.
5  Q.  How about the statement of Mr. Cohen, was
6  that shown to him prior to December 16th?
7  A.  That was not shown to him.
8  Q.  How about the phone records, were they
9  shown to him prior to December 16th?
10 A.  No.
11 Q.  Does the District have any written
12 policy, if you know, requiring a person to appear
13 at a Loudermill hearing?
14 A.  A written policy?
15 Q.  Yes.
16 A.  Not that I'm aware of.
17    MR. HERRING: I might not have
18    any other questions, but I need to just
19    chat with my team.
20    ARBITRATOR BROGAN: Off the
21    record.
22    (Brief pause.)
23    ARBITRATOR BROGAN: Back on the
24    record.

artha Yoder, Ed.D. - cross                                          Page 98

1     BY MR. HERRING:
2  Q.  Can you look at Exhibit 11, please.
3  A.  (The witness complies.)
4  Q.  It appears to be undated.  Do you know
5  when that was prepared or sent to Mr. Schanne?
6  A.  I don't recall and it's not dated.
7  Q.  We can agree that on January 24th the
8  Board voted to terminate Mr. Schanne, correct?
9  A.  That is correct.
10 Q.  That is confirmed by Exhibit 12, which is
11 the letter dated January 25th confirming the
12 same?
13 A.  It was at the Board meeting of January
14 23rd.
15 Q.  Had Mr. Schanne's additional counsel ever
16 notified you, if you remember, that he wanted an
17 opportunity to come in and tell his side of the
18 story prior to January 24th?
19 A.  I don't recall.
20    MR. HERRING: I'm going to show
21    you a letter that is dated January 20,
22    2011 --
23    ARBITRATOR BROGAN: Show Mr.
24    Roos.

Martha Yoder, Ed.D. - cross                                         Page 99

1     MR. HERRING: -- that I will show
2  to your counsel first.
3     MR. ROOS: Is this going to be
4  A-2?
5     MR. HERRING: Yes.
6     (Document marked for purposes of
7  identification as A-2.)
8     BY MR. HERRING:
9  Q.  Have you ever seen that document before?
10 A.  Yes.
11 Q.  In sum, Mr. Schanne, through his private
12 counsel, asked for an opportunity to come in
13 prior to January 24th to respond to the
14 allegations, correct?
15 A.  I haven't reread it.
16 Q.  Take a moment.
17 A.  This does not specifically say he wanted
18 to come in and meet with us.
19 Q.  We can argue about its content; but we
20 can agree that no other meeting was ever
21 scheduled prior to the Board vote on January
22 24th?
23 A.  There was no meeting scheduled following
24 the January 18th scheduled meeting that was

Martha Yoder, Ed.D. - cross                                        Page 100

1  canceled and the Board action.
2     MR. HERRING: I have nothing
3  further, thank you.
4     ARBITRATOR BROGAN: Can someone
5  describe the document for the record.
6     MR. ROOS: It's a January 20th
7  letter from Mr. Ely's office to Dr.
8  Yoder.
9     ARBITRATOR BROGAN: Thank you.
10 Anything further?
11    MR. ROOS: I have no additional
12 questions.
13    ARBITRATOR BROGAN: Thank you,
14 Dr. Yoder.
15    MR. ROOS: Unfortunately, our
16 next witness is not able to be here until
17 3:30; but that will give us some time to
18 work out some stipulations as far as when
19 Mr. Herring received the phone records,
20 the statements and also to copy the
21 exhibits that haven't been copied to this
22 point.
23    ARBITRATOR BROGAN: Let's go off
24 the record.

# EXHIBIT "D"

 **LOWER MERION SCHOOL DISTRICT**
301 E. Montgomery Avenue, Ardmore, PA 19003-3399
Phone 610-645-1931  Fax 610-645-9536 · www.lmsd.org

Marty A. Yoder, Ed.D.
Director of Human Resources

**March 28, 2011**

**U.S. First Class and Registered Mail**

Mr. Robert Schanne
281 Ivy Lane
Glen Mills, PA  19342

**AMENDMENT TO STATEMENT OF CHARGES AND NOTICE OF HEARING:**

Dear Mr. Schanne:

As a result of your having recently filed a civil complaint in federal court against Ms. Jenna Addis, the Board of School Directors of the Lower Merion School District was surprised to learn that you are now accusing Ms. Addis of "manufacturing details about an alleged improper relationship" after you purportedly revealed to her that you were in a serious relationship with another woman.  During the District's investigation of this matter, you were provided at least two formal opportunities to respond to Ms. Addis' serious claims against you. At no time, however, did you bring any of this highly pertinent information to the District's attention.

For this reason, the District hereby amends the Statement of Charges and Notice of Hearing issued to you on January 19, 2011.  In addition to the reasons supporting the District's recommendation for termination set forth therein, you are being charged with following:

- Failing to participate in the District's investigation or to respond to the allegations being levied against you by Jenna Addis during the time that this matter was pending before the District's administration and/or Board of Directors.

- Failing to provide the District, during the course of its investigation, the statements allegedly made by Ms. Addis to you as cited in your lawsuit (*Schanne v. Addis*, Civ.A.No.2:11-cv.018510-AB), thereby denying the District the opportunity to consider this information.

For these additional reasons, the District hereby supports its recommendation for termination of your employment.

You previously elected to grieve your termination in lieu of a Board hearing. To this end, the District will consider the foregoing amendment subject to that election and will become an issue to be decided by the arbitrator. If you have any questions, please contact your attorney, Charles Herring, Esq.

LOWER MERION SCHOOL DISTRICT

BY:

David A. Ebby, President, Lower Merion School
District Board of School Directors

ATTEST:

Frances Kenveney, Secretary, Lower Merion School
District Board of School Directors

cc: Dr. Christopher McGinley, Superintendent

Dr. Marty Yoder, Director of Human Resources

Kenneth A. Roos, Solicitor

Megan E. Shafer, Esquire

Mr. Chris Santa Maria, LMEA Representative

Charles Herring, Esquire